# Moore Estate

*John B. Taulane, Jr.*, and *John J. Bradley*, of *Gilfillan, Gilpin & Brehman*, for accountant.

*James J. Convery*, amicus curiae, p.p.

*James W. Sutton, Jr.*, for Commonwealth as parens patriae.

SHOYER, *J.*, April 8, 1975—William J. Moore died on May 26, 1933, leaving a will dated February 18, 1927, whereby he gave his residuary estate to his wife, Eva C. Moore, and Girard Trust Company, to pay his brother, Temple B. Moore, $50 monthly from the income and the balance of the income to his wife, during her life, and upon her death to pay certain pecuniary legacies, and the balance to be retained in trust to pay $75 monthly to testator's niece, Carrie Moore, for life, and the balance of the net income to "be used to assist students male and female of Temple University . . . with said income to be remitted to the Treasurer of said Temple University and apportioned among deserving students by the President and Board of Trustees of said Temple University. . .," with alternate provision for Shriners Hospital, and, in paragraph 9 of the will, directed "that the balance of income from my said ultimate residuary estate after payment of said annuity to Carrie Moore shall be accumulated until the principal of said estate together with such ac-

cumulations shall amount to five hundred thousand dollars and that thereafter only the income from such combined fund of five hundred thousand dollars shall become available for the purposes of the trust for the students of Temple University or for Shriners Hospital as the case may be."

The fund being here accounted for was awarded under the adjudication of Sinkler, *J.*, dated October 26, 1934, and schedule of distribution dated May 14, 1935, to the Girard Trust Company in trust for Carrie Moore and Temple University. That adjudication recites, inter alia, that testator's widow, Eva C. Moore, elected to take against the will, thereby accelerating the provisions effective upon her death, and awarded the widow's share to her and made awards to the pecuniary legatees.

This account was filed because Carrie Moore, annuitant, died on June 8, 1972. It appears from the statement of proposed distribution that she left no estate subject to administration and no personal representative is to be appointed.

Attached hereto is a waiver by Temple University of a full amount of income.

Also attached is a copy of the notice to the Attorney General as parens patriae of gifts to charities and the clearance certificate executed by James W. Sutton, Jr., Special Assistant Attorney General, as required by *Rule 55.

The statement of proposed distribution and notice to the parties in interest raise the question whether the trust is subject to the provisions of the Charitable Instruments Act of 1971, 10 P.S. §201-206. The notice recites that this act applies to "charitable organizations" under section 509 of the Internal Revenue Code of 1954, as amended, which

are treated as private foundations under that section of the code. The accountant takes the position that upon the death of the life tenant on June 8, 1972, the trust ceased to be exempt from the classification of a private foundation, as a split interest trust: I.R.C. §4947(2). As of that date, the trust qualified as a private foundation under section 509 of the Tax Reform Act of 1969, amending the Internal Revenue Code. Section 4942 of the I.R.C., as thus amended, subjects the undistributed trust income to the income tax annually. Therefore, despite the fact that paragraph 9 of decedent's will provides that the trustee is to accumulate income until the trust res is $500,000, it is the position of the trustee that the direction in the will to accumulate is superseded by the Charitable Instruments Act, supra, and, as of June 8, 1972, the trustee may no longer accumulate the income, but is required to distribute it in accordance with paragraph 8 of decedent's will, as modified by the Charitable Instruments Act. It is the position taken by the accountant that the trust instrument, the will, is deemed to now include the provisions set forth in section 1 (1) of the Charitable Instruments Act, which provides:

"The governing instrument of any charitable organization shall be deemed to include provisions, the effect of which are

"(1) To require distributions for each taxable year in such amounts and at such times and in such manner as not to subject the organization to tax under section 4942 of the Internal Revenue Code of 1954 . . ."

Counsel for the accountant submitted a memorandum of law in which he points out that

section 5 (2) of the act provides that the Charitable Instruments Act shall apply "after December 31, 1971, to every charitable organization created before January 1, 1970, unless a court of competent jurisdiction in a proceeding instituted before January 1, 1972, should explicitly decide that the operation of section 1 of this act would substantially impair the accomplishment of the purposes of the charitable organization involved in that proceeding."

Counsel points out that the court in Finley Trust, 60 D. & C. 2d 38, 22 Fiduc. Rep. 584 (1972, O. C. Div., Allegheny Co.), held that section 1 (1) of the Charitable Instruments Act would substantially impair the purpose of the charitable trust before the court and, therefore, section 1 (1) was inapplicable.

Counsel contends, however, that in Finley, supra, the proceedings to determine the applicability of section 4944 of the I.R.C. to that trust were instituted prior to January 1, 1972, whereas in the trust now before the court, the proceedings were not instituted until January 25, 1973, more than a year after the cut-off date fixed in section 5 (2) of the Charitable Instruments Act.

In view of the foregoing, the court, sua sponte, by decree of Shoyer, J., dated June 12, 1974, appointed James J. Convery amicus curiae.

Mr. Convery's comprehensive and very able report is hereto attached.

He therein cites Trexler Trust, 24 Fiduc. Rep. 494 (1974, O. C. Div., Lehigh Co.), where President Judge Coyne held that the Charitable Instruments Act of 1971 did not automatically excise a direction that one-fourth of income from the charitable trust there involved be accumulated. In reviewing the

reasons for enactment of the Charitable Instruments Act, the court stated, at page 498:

"The 'Explanation' makes it perfectly clear that the sole purpose of the Act was to make it possible for charitable organizations, if not exempted from the Tax Reform Act in any way, to have their governing instruments reformed without the necessity of a judicial proceeding. . . ."

The law of Pennsylvania permits the accumulation of income, inter alia, in a trust for charitable purposes: Probate, Estates and Fiduciaries Code, sec. 6106(b)(1), formerly sec. 6(b)(1) of the Estates Act of 1947, P.L. 100, 20 P.S. §6106(b)(1); Cf. James Est., 414 Pa. 80 (1964), reversing 13 Fiduc. Rep. 636, 31 D. & C. 2d 1 (Orphan's Court, Phila.).

In James, supra, the Supreme Court in construing section 6(b)(1) of the Estates Act of 1947, as amended, said at pages 85-6:

"We may not view the statute as the mere utilization of words employed in an exclusively literal sense without regard to the social circumstances, charitable needs and public policy surrounding the legislation. So considered, its provisions require the application of a doctrine of *reasonableness*." (emphasis supplied.)

Directions in the James Will to accumulate for 400 years were held to be *un*reasonable and, consequently, void.

The account here being audited shows an account value of the corpus as of November 16, 1972, of $116,342.38, with a market value of $173,511.31 as of that date. The account shows the sum of $446.67, balance of income, cash on hand, after distribution of $2,600 to Temple University on

November 10, 1972. The current market value of the trust is stated to be approximately $131,000, including accrued income. It is estimated that with future income accumulations at a six percent rate, compounded annually, the fund will amount to $500,000 in approximately 23 years; at a five percent rate, compounded annually, it will take a little more than 28 years to reach the $500,000 directed by the testator. The current return is approximately 7½ percent.

In view of the stipulation of the parties, I find as a fact that the testamentary direction in paragraph 9, to accumulate income until the fund will amount to $500,000 is reasonable, lawful and permissible under section 6106(b)(1) of the Probate, Estates and Fiduciaries Code of 1972, and the rule in James Estate, supra.

During the lifetime of Carrie Moore, Temple University was entitled to the income in excess of that required to pay her annuity, and the so-called "split interest" trust came within the definition of section 4947(a)(2) of the I.R.C.

The Charitable Instruments Act of 1971 was amended by Act No. 160 of 1972, effective June 30, 1972, to specifically include a "split interest" trust in the definition of a "charitable organization."

After the death of Carrie Moore (June 8, 1972), the trust fell within the provisions described in section 4947(a)(1) of the I.R.C., and thus became subject to the provisions of the Charitable Instruments Act of 1971.

The Charitable Instruments Act of 1971 became effective immediately upon enactment and applied to every "charitable organization," as defined in the act, created before January 1, 1970, "unless a court of competent jurisdiction in a proceeding in-

stituted before January 1, 1972, should explicitly decide that the operation of section 1 of this act would substantially impair the accomplishment of the purposes of the charitable organization involved in that proceeding."

Section 4942 of the I.R.C., added by the Tax Reform Act of 1969, provides:

"(a) Initial Tax.

"There is hereby imposed on the undistributed income of a private foundation for any taxable year, which has not been distributed before the first day of the second (or any succeeding) taxable year (if such first day falls within the taxable period), a tax equal to 15 percent of the amount of such income undistributed at the beginning of such second (or succeeding) taxable year . . ."

"(b) An Additional Tax.

". . . if any portion of such income remains undistributed at the close of the correction period, there is hereby imposed a tax equal to 100 percent of the amount remaining undistributed at such time."

Sections 4942(c) and (d) define the "undistributed income" as: (1) "the higher of the minimum investment return or the adjusted net income reduced by (2) the sum of the qualifying distributions (timely made) and the taxes imposed on such private foundation for the taxable year."

Section 4942(e) defines the "minimum investment return" as an applicable percentage of the aggregate fair market value of all net assets of the foundation other than those assets being used or held for use in directly carrying out the exempt purposes of the foundation. The "applicable percentage" for a private foundation in existence on May 26, 1969, is to be set periodically by the Secretary of the Treasury or his delegate (reflecting

changing money rates and investment yields), but cannot exceed 4½ percent in 1972, 5 percent in 1973, 5½ percent in 1974 and 6 percent in 1975 and thereafter. For a foundation organized prior to May 27, 1969, the applicable percentage has been fixed at 4.375 percent.

It is stated (amicus curiae's report, page 9) that as of November 30, 1974, this trust was realizing an investment return of 7½ percent.

Nevertheless, it is possible that during the time required to attain the accumulation directed by testator there may be need to invade the "corpus" in order to provide the "minimum investment return" as defined in section 4942(c) of the I.R.C.

However, the Tax Reform Act of 1969 contains certain savings provisions applicable to organizations organized before May 27, 1969. Section 101(1)(3) of that act, to the extent here applicable, provides that section 4942 shall:

"(B) *not apply to an organization to the extent its income is required to be accumulated pursuant to the mandatory terms* (as in effect on May 26, 1969, and at all times thereafter) *of an instrument executed before May 27, 1969*, with respect to the transfer of income producing property to such organization, except that section 4942 shall apply to such organization if the organization would have been denied exemption if section 504(a) had not been repealed by this Act, or would have had its deductions under section 642(c) limited if section 681(c) had not been repealed by this Act. In applying the preceding sentence, in addition to the limitations contained in section 504(a) or 681(c) before its repeal, section 504(a)(1) or 681(c)(1) shall be treated as not applying to an organization to the extent its income is required to be accumulated

pursuant to the mandatory terms (as in effect on January 1, 1951, and at all times thereafter) of an instrument executed before January 1, 1951, with respect to the transfer of income producing property to such organization before such date, if such transfer was irrevocable on such date"; (emphasis supplied).

"(E) *not apply to an organization which is prohibited by its governing instrument or other instrument from distributing capital or corpus* to the extent the requirements of section 4942 are inconsistent with such prohibition." (emphasis supplied).

"With respect to taxable years beginning after December 31, 1971, *subparagraphs (B) and (E) shall apply only during the pendency of any judicial proceeding* by the private foundation which is necessary to reform, or to excuse such foundation from compliance with, its governing instrument or any other instrument (as in effect on May 26, 1969) in order to comply with the provisions of section 4942, and in the case of *subparagraph (B) for all periods after the termination of such judicial proceeding during which the governing instrument or any other instrument does not permit compliance* with such provisions." (emphasis supplied).

Plainly, the instant will, executed in 1927 and effective on testator's death in 1933, made an irrevocable transfer to his trustees and mandated the accumulation of income on Carrie Moore's death and was effective on January 1, 1951, meeting all the requirements of the savings provisions of section 101(1)(3)(B) of the I.R.C.

Since the will, paragraph 9, directs the accumulation of income until "the principal . . . together

with such accumulations shall amount to five hundred thousand dollars and that *thereafter only the income from such combined fund . . .* shall become available for the purposes of the trust . . .," it is evident that the corpus must continue in trust, and that the requirements of the savings provisions of "(E)" are also complied with.

The Internal Revenue Service, in a ruling dated May 3, 1974, requested by counsel's letter of October 18, 1973, concludes:

"However, pursuant to section 101(1)(3)(B) of the Savings Provisions of the Tax Reform Act of 1969, your Fund is not subject to tax under Code section 4942 for taxable years beginning after December 31, 1971, during the pendency of judicial proceedings to enable compliance with Code section 4942, and for all periods after termination of judicial proceedings during which the governing instrument does not permit compliance."

In the circumstances, the testamentary provisions do not require the aid of the Charitable Instruments Act of 1971; this trust will not be subject to the tax imposed under section 4942 because of the accumulation of the income.

The instant account was filed on January 25, 1973, and these proceedings were commenced well within the 91-day period allowed by the regulations issued at section 1.508(3)(g), extending the time provided in section 508(e) for the commencement of the judicial proceedings required by the regulations designated as section 1.170 A-9.

Construing the currently operative direction to accumulate income in the will of William J. Moore, the auditing judge does explicitly decide that the testamentary direction is mandatory and that a failure to accumulate would substantially impair

the accomplishment of the lawful purposes of testator, and we conclude, as in Trexler Trust, that the testamentary provision for accumulation of income has not been excised from this will by operation of section 1(1) of the Charitable Instruments Act of 1971, 10 P.S. §201(1).

The accountant's position that the trust instrument is deemed to include provisions set forth in section 1(1) of the Charitable Instruments Act of 1971, 10 P.S. §201(1), is ill-advised and rejected. As to section 1(2), 10 P.S. §201(2), of that act, the auditing judge approves the statement of the court in Finley Trust, supra, page 588:

"Even in the absence of said statute, this court would and does hereby authorize a deviation from the express terms of the trust so as to include such provisions in the testamentary trust involved in this proceeding."

Accordingly, we now hold that the will of William J. Moore is reformed and henceforth deemed to include among its provisions the following prohibitions, namely, the trustees are prohibited from engaging in any act of self-dealing (as defined in section 4941(d) of the Internal Revenue Code of 1954) and from retaining any excess business holdings (as defined in section 4943(c) of that code) and from making any investment in such manner as to subject the organization to tax under section 4944 of that code and from making any taxable expenditure as defined in section 4945(d) of that code.

The accountant is directed to abide by the testamentary direction for accumulation of income.

Credit is taken in the account for the distribution of the sum of $2,600 income on November 10, 1972, to the "Treasurer of Temple University for scholarships in accordance with Section 8(B)."

The accountant raises the question whether it is required to see if the university applies the income in accordance with the provisions of the trust.

The testamentary direction to apply the income for scholarships denies the use of income for any other purpose. It is the duty of the trustee to satisfy itself that the distribution is applied in accordance with the testamentary direction.

Since the $2,600 distribution was made pursuant to the advice of counsel, the trustee will not be surcharged for this distribution. However, the $2,600 will be refunded to principal from income received in the future.

Except as above, the report of the amicus curiae is approved.

The accountant is directed to file a further account of the trust at the expiration of ten years from the date hereof, unless sooner directed by the court.

The court considers a timely review of the stewardship of the trustee to be desirable, showing the progress of the fund toward its goal of $500,000.

All of the parties in interest are stated to be sui juris and to have notice of the audit and the questions involved.

There was no objection to the account, which shows a balance of principal of        $116,342.38
less:  James J. Convery, Esq.,
       compensation as
       Amicus Curiae          $1,000.00
       John B. Taulane, Esq.,
       As per appearance slip      5.00    1,005.00
                        leaving  $115,337.38
which, composed as indicated in the account, is awarded back to the accountant, in further trust, for the uses and purposes declared in the will of William J. Moore, deceased.

The account shows a balance of income of        $ 3,721.67
deduct:    credit shown on counsel's appearance slip for distribution to Anna B. Elliott     32.50
                     leaving   $ 3,689.17
which, composed as indicated in the account, together with income since received, subject to distribution heretofore properly made, is awarded back to the accountant, for accumulation in accordance with the will of William J. Moore, deceased.

Accountant is authorized to make the necessary transfers, as above.

And now, April 8, 1975, the account is confirmed nisi.